2005 VT 78

## Estate of Nicholas P. Gage, et al. v. State of Vermont

[882 A.2d 1157]

No. 03-403

Present: **Dooley, Johnson, Skoglund and Reiber, JJ., and Allen, C.J. (Ret.),**[1] **Specially Assigned**

Opinion Filed July 22, 2005

---

[1] Chief Justice Allen sat for oral argument but did not participate in this decision.

*Robert A. Mello* and *Richard J. Holmes* of *Robert A. Mello & Associates, PLC*, South Burlington, for Plaintiffs-Appellees.

*William H. Sorrell*, Attorney General, and *Eve Jacobs-Carnahan*, Assistant Attorney General, Montpelier, for Defendant-Appellant.

¶ 1. **Johnson, J.** This appeal requires us to determine whether the discretionary function exception to the Vermont Tort Claims Act applies to immunize the State of Vermont from a negligence action arising out of an incident in which a vehicle left the roadway, flipped over a guardrail, rolled down an embankment, and landed in a brook, resulting in several drowning deaths. The State contends the decision whether to remove or guard against the drowning hazard involved policy considerations of the kind the discretionary function exception was designed to shield from suit. We agree, and therefore reverse the

trial court judgment denying the State's motion for summary judgment.

¶ 2. The tragic events underlying this appeal may be briefly summarized.[2] Additional material facts will be adduced in the discussion that follows. Early on the morning of March 2, 1998, Gregory Twofoot was driving south on Interstate 91. Twofoot had been drinking prior to operating the vehicle. Robin LaFont, one of five passengers in the vehicle, asked Twofoot to pull over to the side of the Interstate so that he could look in the trunk for beer. When Twofoot refused, LaFont reached forward from the back seat and pulled the wheel to the right, causing Twofoot to lose control. Twofoot applied the brakes and the car skidded over two hundred feet, spun around, and struck the butt end of a guardrail at its northernmost point. The car then careened along the top of the guardrail an additional thirty feet with its two rear wheels over the guardrail and the front two tires dragging along the ground behind it. One of the rear wheels then ripped off and the car became airborne and rolled to the bottom of an embankment where it landed upside down in Cobb Brook, in four feet of water, about 90 feet from the edge of the traveled roadway and some 500 feet from where Twofoot first lost control. Four of the passengers drowned in the water. The driver and one passenger survived.

¶ 3. The estate of Nicholas Gage (hereafter plaintiff), one of the four passengers who died, brought this lawsuit against the State, claiming that it was negligent in failing to extend the guardrail further north, which allegedly would have prevented the vehicle from reaching the water, or in failing to remove a series of beaver dams that had increased the depth of the water in Cobb Brook, resulting in decedent's drowning death.[3] The State moved for summary judgment on the ground, among others, that it was immune from suit under the discretionary function exception to the Tort Claims Act, 12 V.S.A. § 5601(e)(1).[4] Following a hearing, the court issued an entry order

---

[2] The facts set forth below were those on which the parties generally agreed.

[3] The complaint also alleged that the State was negligent in initially constructing the Interstate according to its design plans, but plaintiff has not pursued this claim.

[4] This section provides that the State is not liable for

> [a]ny claim based upon an act or omission of an employee of the state exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation is valid, or based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part

summarily denying the motion. The court also denied the State's subsequent motion for reconsideration, or, in the alternative, for permission to file an interlocutory appeal. The State then renewed its motion for permission to appeal with this Court. We granted the motion to consider the State's sovereign immunity claim.

¶ 4. The controlling law is well settled. Lawsuits against the State are barred unless the State waives its sovereign immunity. *Denis Bail Bonds, Inc. v. State*, 159 Vt. 481, 484-85, 622 A.2d 495, 497 (1993). Under the Vermont Tort Claims Act, 12 V.S.A. § 5601(a), the State has waived its immunity for injury to persons caused by the negligent act or omission of a State employee while acting within the scope of employment, subject to certain delineated exceptions. One of these exceptions is set forth in § 5601(e)(1), which protects the State from any claim "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused."[5] The purpose of the discretionary-function exception is to assure that courts do not invade the province of coordinate branches of government through "judicial second guessing of legislative or administrative policy judgments." *Searles v. Agency of Transportation*, 171 Vt. 562, 563, 762 A.2d 812, 814 (2000) (mem.).

¶ 5. In *Searles*, we adopted the two-part test utilized by the United States Supreme Court for determining the applicability of the nearly-identical discretionary function exception in the Federal Tort Claims Act. *Id.* at 563-64, 812 A.2d at 813-14; see also *Lane v. State*, 174 Vt. 219, 223-24, 811 A.2d 190, 194 (2002) (explaining and applying two-part discretionary function test). This test, established in *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991), first asks whether a statute, regulation, or policy specifically prescribes a course of action for the employee to follow. If so, then the discretion requirement is not met. *Id.* If, however, the acts involved are "discretionary in nature," involving "'an element of judgment or choice,'" the first prong of the test is satisfied. *Id.* at 322 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). The court must then decide under the second prong whether that judgment involved considerations of public policy which the discretionary function exception was designed to protect. *Id.* at

---

of a state agency or an employee of the state, whether or not the discretion involved is abused.

[5] See footnote 4, *supra*, for the full text of this section.

323. Under *Gaubert*, it is presumed that when a government agent is authorized to exercise discretion the agent's acts are grounded in policy when exercising that discretion. *Id.* at 324. Thus, to survive a motion for summary judgment, a plaintiff must allege facts sufficient to overcome the presumption that the discretion involved policy considerations. *Id.* The focus of the court's inquiry, furthermore, is not on the official's specific subjective intent in exercising the discretion conferred, but on the general "nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 324-25.

¶ 6. In support of its motion for summary judgment, the State here offered the testimony and affidavits of multiple State officials and employees attesting to the State's discretionary policy governing the removal of, or the placement of guardrails around, hazards such as Cobb Brook. In sum, the State's policy is to remove or guard against all such hazards within thirty feet of the edge of the driving lane. Where, as here, the hazard lies outside the thirty-foot "clearzone," the decision to remove or guard against such a hazard is left to the judgment of the State's highway officials. Among the factors considered in making such a decision are the likelihood of an errant vehicle reaching the hazard — which in turn involves both engineering calculations of speed and terrain as well as the history of accidents at the location — weighed against such factors as the nature and gravity of the risk of injury, the cost of removal or protection, and the environmental and aesthetic impact of removing or guarding against the hazard. Officials also must weigh the likely efficacy of a guardrail in the location in question against the fact that guardrails themselves pose risks to the traveling public.

¶ 7. The evidence here thus established not only that the State's policy vested extensive discretion in its highway officials to determine whether to remove or guard against such hazards as Cobb Brook, but also that the determination involved precisely the kind of policy judgments — the weighing of risks, financial costs, and environmental and aesthetic impacts — that the discretionary-function exception was designed to protect. See, e.g., *Elder v. United States*, 312 F.3d 1172, 1180-83 (10th Cir. 2002) (park managers' decision whether to place guardrails or warnings along trail to prevent visitors from falling off ledge — which included such factors as the risks of safety measures themselves, cost/benefit analysis, and aesthetic considerations — involved policy judgments protected by discretionary function exception); *Rosebush v. United States*, 119 F.3d 438, 444 (6th Cir. 1997) (decision whether to place railings around fire pit in park required

"balancing the needs of the . . . users, the effectiveness of various types of warnings, aesthetic concerns, financial considerations, and the impact on the environment" and therefore was "within the discretionary function exception"); *Baum v. United States*, 986 F.2d 716, 724 (4th Cir. 1993) (decision to upgrade or replace guardrail on bridge "is inherently bound up in considerations of economic and political policy, and accordingly is precisely the type of governmental decision that Congress intended to insulate from judicial second guessing through tort actions for damages"); *Bowman v. United States*, 820 F.2d 1393, 1395 (4th Cir. 1987) (affirming dismissal of lawsuit brought by driver of vehicle that slid off highway and down embankment on ground that decision whether or not to install guardrail "was the result of a policy judgment"); *Fisher v. County of Rock*, 596 N.W.2d 646, 653 (Minn. 1999) (holding that county's failure to add approach guardrails to a bridge was based on the "application of the county's bridge replacement policy, a policy that balanced roadway safety considerations and economic burdens" and therefore within the discretionary function exception). As the court in *Bowman* cogently observed: "[O]fficials have more than safety in mind in determining the design and use of . . . guardrails . . . . These decisions require balancing many factors: safety, aesthetics, environmental impact and available financial resources. . : . It is precisely this type of decision which Congress intended to shield from liability because 'where there is room for policy judgment and decision, there is discretion.'" 820 F.2d at 1395 (quoting *Dalehite v. United States*, 346 U.S. 15, 36 (1953)).[6]

¶ 8. Plaintiff's arguments to the contrary are unpersuasive. Plaintiff first asserts that summary judgment was improper because there was evidence the State had adopted a mandatory policy of removing or guarding against water hazards in excess of two feet in depth when an errant vehicle is likely to reach the hazard. Plaintiff relies on a 1986 Agency of Transportation publication entitled "Maintenance Guide for Highway Guardrail" (Guide) as evidence of such a policy, as well as an expert's opinion that a vehicle leaving the freeway in the circumstances of this case was likely to reach Cobb Brook absent a guardrail extending further north. Although the State initially disputed whether it had

---

[6] Because the discretionary function exception to the Vermont Tort Claims Act is nearly identical to that of the Federal Tort Claims Act, "[t]his Court therefore looks to case law interpreting the federal provision to guide us in analyzing 12 V.S.A. § 5601(e)." *Lane v. State*, 174 Vt. 219, 223 n.2, 811 A.2d 190, 192 n.2 (2002).

ever formally adopted the Guide as policy for Interstate 91, the point is immaterial, for the Guide itself fails to support plaintiff's claim.

¶ 9. In relevant part, the Guide establishes — consistent with State policy — a thirty-foot clearzone within which all fixed obstacles and "nontraversable hazards" (defined to include water more than two feet in depth) should be removed. The Guide also contains a graph, known as Figure B, to calculate the clearzone for hazards outside the thirty-foot minimum based on such factors as operating speed and shoulder slope. Plaintiff maintains that, applying this formula, Cobb Brook lies within the clearzone measured from the edge of Interstate 91. The Guide, however, not only states but emphasizes that "Figure B shows *suggested* criteria for determining the clearzone ...." (Original emphasis.) Plainly, therefore, the Guide does not purport to impose a mandatory calculus, but merely "suggested criteria," for the determination of whether a hazard lies within a clearzone requiring removal or other protection. Indeed, the same section of the Guide goes on to explain that although the engineering principles applicable to different categories of roads may be the same, the "probability" of an accident and "the economic factors" may differ. Therefore, according to the Guide, "[t]he same principles apply but *judgment* is required in their application." (Emphasis added.) The Guide also explicitly recognizes that "a guardrail itself is a hazard" and "should be installed only if it is clear that the rail offers less of a hazard" than the condition to be guarded against.

¶ 10. Thus, by its own terms the Guide makes clear that its criteria are "suggested" not mandatory, that "judgment is required in their application," and that other factors may enter into the determination of whether a hazard lies within the clearzone requiring removal or guardrail protection. The Guide does not, therefore, support plaintiff's claim that the decision to identify Cobb Brook as a hazard within the clearzone represented a simple, mandatory calculation that the State's engineers negligently failed to perform. Like the traffic-control manual at issue in *Searles*, which provided that it was "not a substitute for engineering judgment," 171 Vt. at 564, 762 A.2d at 814, the highway Guide in this case does not set forth a "specific prescription" but rather retains a broad element of discretion in the officials responsible for its application. *Id.* The fact that plaintiff's expert, applying the Guide's suggested criteria, determined that Cobb Brook was within the clearzone at the point of the Interstate where the accident occurred may lend support to a claim that the State abused its discretion, but it does not alter the fundamental nature of the State's discretion.

Accordingly, there is no genuine dispute that the State has satisfied the first prong of the discretionary-function exception.

¶ 11. Plaintiff also argues that, even assuming such discretion, the State's failure to remove or adequately guard against the hazard posed by Cobb Brook was not based on a policy judgment, and therefore does not satisfy the second prong of the discretionary-function exception. As noted, we presume that the discretion involved policy considerations, and the burden is on plaintiff to "'present specific facts sufficient to rebut the presumption.'" *Searles*, 171 Vt. at 565, 762 A.2d at 815 (quoting *Baldassaro v. United States*, 64 F.3d 206, 212 (5th Cir. 1995)). As also previously noted, ample record evidence supports the conclusion that the decision to remove or guard against such roadside hazards as Cobb Brook reflects a policy judgment based on safety, economic, and environmental factors. As one highway official succinctly stated: "The Agency of Transportation is consistent[ly] and constantly trying to balance the provision of safest possible highway at a reasonable cost, versus protection of the piece of Vermont that brings tourists and residents to Vermont."

¶ 12. Plaintiff's effort to rebut this evidence rests on the testimony of several highway officials describing the removal of a beaver dam as a "routine maintenance operation," as well as testimony that removal of the dam or, in the alternative, the modest extension of a guardrail would involve only nominal costs. Plaintiff thus argues that the discretionary-function exception affords no protection to such allegedly routine ministerial tasks. The argument does not withstand scrutiny. Ministerial maintenance decisions of the kind suggested by plaintiff have been described as the mere "implementation of a previous policy decision," *State v. Barraza*, 157 S.W.3d 922, 928 (Tex. App. 2005), or "routine periodic maintenance mandated by explicit policy." *Mitchell v. United States*, 225 F.3d 361, 364 (3d Cir. 2000). Here, however, the testimony on which plaintiff relies made quite clear that, although the physical removal of a beaver dam may represent a routine maintenance "operation," the actual decision to do so represents a policy judgment based on experience and the weighing of multiple factors, including the likelihood of an errant vehicle reaching the hazard, financial cost, and environmental impact. This is precisely the kind of policy judgment that the discretionary-function exception was designed to protect from judicial second-guessing. See *Baum*, 986 F.2d at 724 (holding that alleged negligence in maintaining guardrail posts implicated, at bottom, a decision "of how and when" to replace elements of highway system that was "inherently bound up in consid-

erations of economic and political policy" within the discretionary-function exception).

¶ 13. Furthermore, focusing on the cost of one isolated repair misapprehends the nature of the discretionary-function exception, which looks to the general "nature of the actions taken" rather than the official's "subjective intent" in any individual case. *Searles*, 171 Vt. at 565, 762 A.2d at 814-15 (observing that "[t]he intersection at issue is just one of many dirt road intersections in Vermont," and thus the State was not required to prove "that it made a conscious decision, based upon policy considerations, not to place a warning sign at every dirt road intersection in Vermont"); *Mitchell*, 225 F.3d at 366 (in concluding that discretionary-function exception barred negligence action for failure to remove or upgrade highway culvert, court noted that "[t]he Park Service had to balance the costs of the repairs of every culvert head-wall along Route 209, along with . . . other safety issues . . . against the low risk of an accident").

¶ 14. Although plaintiff cites several decisions holding the discretionary-function exception to be inapplicable to maintenance failures, these cases are largely distinguishable based on the absence of any evidence of an underlying policy judgment. See *Gotha v. United States*, 115 F.3d 176, 181-82 (3d Cir. 1997) (court found no persuasive evidence that failure to install stairway with handrail at Navy facility was product of "military, social and economic considerations"); *Cohen v. United States*, No. 98-CV-2604, 2004 WL 502924, at *7 (E.D.N.Y. Jan. 29, 2004) (concluding that lack of evidence of "competing public policy considerations" underlying decision not to maintain log retainers on walking trail precluded application of discretionary-function exception, although decision not to erect handrails was within the exception); *City of Fort Worth v. Gay*, 977 S.W.2d 814, 817 (Tex. App. 1998) (court found no evidence of policy factors underlying city's alleged negligent failure to clean storm drain). Plaintiff's substantial reliance on *State v. Abbott*, 498 P.2d 712 (Alaska 1972), is similarly misplaced. In concluding that the State's allegedly negligent failure to adequately sand an icy highway was not within the discretionary-function exception, the court there made clear that the conduct at issue did not reflect any policy judgment or weighing of competing social, economic, or environmental factors — "it merely implement[ed] the basic policy decision." *Id.* at 722. Furthermore, although not essential to the decision, the court explicitly relied on a somewhat artificial distinction between "planning" and "operational" level decisions, *id.* at 718, a distinction the United States Supreme Court expressly rejected

in *Gaubert*, 499 U.S. at 325-26 (holding that "[d]iscretionary conduct is not confined to the policy or planning level" and therefore rejecting "a nonexistent dichotomy between discretionary functions and operational activities").

¶ 15. More on point here are cases such as *State v. Barraza*, where the court held that a decision not to upgrade existing guardrails on an interstate highway represented a discretionary policy judgment rather than a ministerial maintenance decision, thus barring suit by a passenger in a vehicle that traveled over a guardrail and rolled down an embankment. 157 S.W.3d at 928; see also *Mitchell*, 225 F.3d at 364, 366 (holding that decision not to remove or upgrade aging highway culvert was a discretionary judgment rather than "routine periodic maintenance" where government had "articulated several policy considerations" underlying decision); *Autery v. United States*, 992 F.2d 1523, 1531 (11th Cir. 1993) (rejecting plaintiff's claim that park service's failure to remove decaying locust tree constituted negligent failure to implement maintenance policy, where evidence showed that identification of hazardous trees for removal was discretionary judgment based on economic and environmental factors); *Hennes v. Patterson*, 443 N.W.2d 198, 204 (Minn. Ct. App. 1989) (highway maintenance department's failure to remove snowbank from highway barrier was not maintenance omission but rather product of resource allocation "based on competing factors of safety of the public, safety of its workers, limitations of its budget, and availability of equipment," and therefore within discretionary-function exception).

¶ 16. Here, as in the foregoing decisions, the conduct at issue was not the State's implementation of a specific pre-existing policy for removal of roadside hazards, but its identification of such hazards for removal, balancing safety, cost, and environmental factors. Such policy considerations fall squarely within the discretionary-function exception. *Gaubert*, 499 U.S. at 323 (purpose of the exception is to prevent judicial second-guessing of administrative decisions "'grounded in social, economic, and political policy'") (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)). Accordingly, there is no genuine dispute that the second prong of the discretionary-function exception is satisfied, thereby immunizing the State from suit. The trial court decision denying the State's motion for summary judgment based on sovereign immunity was therefore incorrect, and must be reversed.

*Reversed.*